Yes, thank you Judge Fletcher. May I please the court Hannah Chardoff on behalf of the petitioner, Ms. Perez. I'll try to reserve three minutes for rebuttal. Okay, we'll try to help you. Ms. Perez is the survivor of domestic violence and she suffers from continuing effects from years of abuse including post-traumatic stress disorder and a neurocognitive disorder. Yet the government denied her relief from that abuse. As Ms. Perez has explained, her two-year-old daughter was kidnapped by her abuser and held for ransom. Her abuser then demanded that Ms. Perez break into a home to give him money, which she then did and was arrested. It is undisputed that there was no violence during that break-in and that Ms. Perez was unarmed. The government and BIA nonetheless concluded that that was a standard making several reversible errors in direct violation of this court's decisions in Flores Vega v. Barr and Gomez Sanchez v. Sessions. For any one of those legal errors, the court should grant Ms. Perez's petition and vacate the BIA's decision. In addition, the BIA's conclusion that Ms. Perez would not likely face torture if returned to Mexico is not supported by substantial evidence. The record compels the conclusion that Ms. Perez would be unable to relocate internally and that the Mexican government would acquiesce to her torture. Ms. Perez testified that she fled from her abuser Mr. Lopez and he nonetheless tracked her down, just as in this court's case decision in Eri v. Barr and that when the police were called and came to her home and she was screaming for mercy and left after Mr. Lopez paid off the police and the police informed her that this was the way it was for women in Mexico that she had to submit. Ms. Chardoff, I'm not necessarily disagreeing with you, but I think that you've sort of inflated some of the record. She wasn't screaming when the police arrived. I thought the record was that it was a little unclear when the police arrived and it could have been the next day. But there weren't actually percipient witnesses to the abuse. Not that she was screaming for mercy and the police showed up and then her ex-boyfriend, her partner, hit them off. It's not clear from the record, Judge Beatty, when exactly that took place. I know that in the government's brief that it suggests that they might have arrived the next day. It's true that there is only her testimony in support of this point, though that's sufficient under... But did she say, I was screaming and being abused when they arrived? Did she even say that? It's not. Her testimony is quite truncated because of the mental health conditions that she suffers from. And both the IJ and the BIA adopted procedural safeguards because she's a Franco Gonzalez class member and determined that it would take all inconsistencies in the record in her favor. But even if there isn't the evidence of the screaming for mercy, we also have this testimony, first of all, that she testified that she regularly had facial bruises that would have been obvious to someone who saw her. And also that the police paid, that Mr. Lopez paid off the police, gave her this warning that this was what she had to expect from women in Mexico, as a woman in Mexico, and left. So this case in that sense is... Was there any indication in the record whether this was the local police or national police? No, Your Honor. There isn't any test. Again, her testimony is somewhat sporadic, I think because of her mental health conditions. Well, if the record doesn't support the fact that it's the national police, what does that do to the argument that the police are unwilling or unable to assist her or would acquiesce? Doesn't that case authority say there's a difference between national police and local police? There is also case law that it need only be one public official who would acquiesce in the case of torture. And also, I mean, we're talking about the specific events that occurred here. I mean, her testimony is also supported by the 2017 Human Rights Report that says that... Well, if she went to a different location, that testimony would not apply, necessarily. It may be the case that she would go somewhere else. But again, the testimony in the, or not just her testimony, but the 2017 Human Rights Report also indicates that this is a problem throughout Mexico. It's not limited to particular jurisdictions. What is the problem? What is the problem? That the failure to enforce laws against, laws criminalizing domestic violence and protecting women. And that's in the record in the 2017 Human Rights Report, I believe 18, 18-19. And I think the Human Rights Report's in there a few times as well. The cat issue, I mean, the issue of relocation, we're considering that with respect to her cat claim. Yes. So, I mean, of course, the particularly serious crime issue would affect her eligibility for withholding. And then we're looking at relocation or the possibility that she could do that under cat. Which is analytically different from how that might arise under asylum or withholding. What happens with burden shifting under cat? I mean, if she doesn't have, does she have a finding of past persecution? Does, who has the burden of showing that she can or cannot relocate somewhere within Mexico? For purposes of cat, so to answer first your question, for purposes of cat, there isn't this past versus past persecution arising of presumption here. That's on this court's decision in Maldonado v. Lynch. The petitioner, we have the burden of proving by under a kind of totality of circumstances type test. But the burden is not that, and this is also clear in Maldonado v. Lynch, we're not required to prove that internal relocation is impossible. It's a kind of no factor is dispositive or determinative, I think is the language for Maldonado. So it is a different inquiry than we might have in the asylum or withholding context. And as to the asylum and her withholding only claim, there is no asylum claim in this case. The board, neither the board nor the IG, or at least the board, didn't reach the merits of her withholding claim. It based its conclusion only on the particularly serious crime. Because if they determine it's a particular serious crime, it precludes withholding relief. So they wouldn't, unless they were going to make an alternative holding, they wouldn't go there. That's correct. And there is no alternative holding in this case. So if the court does agree with that, and as the court should with the many legal errors that the board made with regard to the particularly serious crime analysis. Help me with the particularly serious crime, because it seems to me that this is the most promising path for her. And I'm not sure how I can get there. That is to say, the standard of review as to whether or not this is a particularly serious crime, we're required to defer. Were I deciding whether this were a particular serious crime and I look at the circumstances, I think I might go the other way. Tell me why I can overcome the standard of review and conclude that we're, that we should be, that it's compelled actually to find that this is not a particularly serious crime. I think it would be concluding not that it's not a particularly serious crime necessarily. I don't think the court can make that conclusion here, but it would be that the board applied the incorrect legal standard. And therefore, this court should remand so the board can make that decision. What respect did the court make to employ the wrong legal standard? So first, by relying almost exclusively on the inherent nature of burglary and in these hypothetical things that could happen in any burglary conviction. But that did not, in fact, happen here. And that's directly contrary to this court's decision in Flores-Vega v. Barr, where it says that, you know, these outside of the record hypotheses are pure speculation and can't be the basis for the particularly serious crime analysis. It doesn't, I mean, I thought the factors that the agency was to consider for its analysis of a particular serious crime were set out in the BIA's decision in matter of Prentescu, which was then approved by our court in 2010 in Anaya-Ortiz v. Holder. And the first factor is the nature of the conviction. So you might look at the conviction itself without anything else, and it's jaywalking, littering, something like that. And the court would go no further, but that they do need to look at the nature of the conviction. So it seemed to me that the BIA appropriately considered what was the conviction. It was for burglary of an occupied dwelling, or whatever California calls it. So they'd look at burglary, and then they'd go beyond that to the next factor, which is the circumstances and the underlying facts of the conviction, which they did. I don't think that's beyond, I think that's beyond dispute. I mean, you may think they didn't do it enough, but there's certainly discussion about what actually occurred here. Her pre-planning, the getaway car, what she actually said were her reasons for doing it at the time, which did not include any claim of duress or that her daughter had been kidnapped. And then they went on through other factors as well, like the type of sentence, and whether the type of circumstances indicated that this person poses danger. So you're saying, it seems to me you're saying it's improper for them to say, look, this is a type of crime that is by its nature dangerous. It's inherently dangerous because you're not burglarizing a vacant building. You may think nobody's there, they may be there, or it may be exactly what happened in this case. The owners came home in the middle of the crime, which is a particularly dangerous situation. Does it, I mean, are you saying it has to result in injury and violence for it to be particularly dangerous? A few responses, I'll take your question in part, Judge Beatty. First, it is appropriate, as the BIA did here, to start with the nature of residential burglary. I don't disagree with that. But when we see that discussion, that one paragraph of the BIA's decision where it says that, you know, the nature, the inherent danger in residential burglary is revealed in a case like this where it does list, you're correct, that the homeowners returned during that time. And then it proceeds to a, quote, a California case and lists a number of facts that are not, that were not true in this circumstance. So what were they talking about in the other case? I mean, is the other, is the California case addressing why a particular crime, the facts of a particular crime were dangerous? Or were they just, was it a discussion in general of what can happen in a burglary? It's a discussion about what can happen in a burglary, for example, that there might be that the petitioner or that the defendant, it's a criminal case, so the defendant might act in a way that, you know, that harms the individuals. And then their attempt, you know, acts violently in an attempt to hurt the homeowners after they've returned, or that the homeowners themselves might act, hypothetically, might respond violently and then elicit violence from the, from the burglar. But neither of those things are true in this case. Okay, so I guess, I think, trying to think of a hypothetical, suppose a person is pulled over because they have a taillight out, and then the officer approaches the driver's side window, and the person is exuding a strong smell of alcohol, they're slurring their speech, they're doing all sorts of things to give the officer reason to believe that they're under the influence of alcohol. They ask them to exit the car, they do field sobriety tests, they take blood, it turns out the person is highly intoxicated and driving their vehicle, but they didn't crash into anybody, they didn't crash the car themselves, they didn't lead officers on a high-speed pursuit, they didn't kill another driver on the road, but all of those things are inherent dangers of driving under the influence. Because those things didn't happen, does that mean that DUI is not dangerous? I think in a circumstance, in, when we're, for purposes of the particularly serious crime analysis, there also needs to be a discussion in this case, in the board's decision that those things didn't happen in this case, and it's true, in this case, they, the facts are that there was no violence, and there was no danger. But the board acknowledged that, right? I mean, they said what the facts were, and they didn't say anybody was harmed, I mean, they said homeowners came in, she led with a handful of their property, jumped in the getaway car, they didn't say anybody was injured, I mean, I don't see how they didn't consider what actually happened. They didn't, I mean, they didn't state those facts, I think, they didn't, they didn't state any facts that were untrue, they also didn't state the actual facts of this case. I do want to make sure I turn to the other, I know I'm running out of time, but I would like to turn to the other point, which is the discussion of the duress, which I think is also a compelled error on the face, legal error on the basis of Gomez-Sanchez v. Sessions. Judge Beatty, that you said that she didn't, that Ms. Perez didn't, at the time of the offense, say anything about duress, that reason for discounting Ms. Perez's current testimony is flatly contradicted by Gomez-Sanchez v. Sessions, which says that the board is required to consider evidence. It actually doesn't say that, it doesn't say it's required, it says, and I can find it for you, it says they may consider the motive, and so I think you're, I disagree with your characterization of the case, but go ahead. I, my point was that the reason for discounting evidence of motivation cannot be that the, it wasn't raised at the moment of the, during the criminal proceedings. Okay, but the court can consider, and this is from Baer v. Barr, which is a great case name, I assume it's pronounced Baer, B-A-R-E, that the court can consider the conviction records and sentencing information, as well as other information outside the confines of the record of conviction. An awful lot that the agency considered in deciding this, and they considered the pre-sentence report, and the probation officer's assessment, and what she said at the time were her reasons that she needed money, is what she said. And so I don't see why the agency can't consider that. I know I'm over time, is that all right, Judge Fletcher, if I? Oh yeah, please answer the question. Okay, so. It's a short question, and you get to answer it. Thank you. So, first, Judge Beatty, Gomez-Sanchez says that evidence of mental health and the circumstances should be considered regardless of whether that was raised during the criminal proceeding. And the BIA, in that case, gave a very similar reason. He said the BIA, and the government in that case, took the position that because the mental health wasn't considered during the criminal proceedings in Gomez-Sanchez, that it wasn't relevant to the issue of dangerousness, which is BIA. But they did consider her mental health. You're referencing the motive and discussion of duress, which is different, analytically different, than her mental health. They clearly considered that. They implied the protections in the matter of MAM. I mean, they considered her mental health. They talked about other things that she claimed. I agree, Judge Beatty, that mental health and motivation are two factors that the court should consider, both of which are discussed in Gomez-Sanchez explicitly. Both motivation and mental health. The court in Gomez-Sanchez relies on its prior case law about motivation to introduce the issue of mental – to establish that mental health also must be considered. So, to the extent – you know, that's a first response. The second response, I think, is that there is no suggestion here that Ms. Perez was not credibly testifying about her duress. The IJ found her explicitly credible. There was no questioning. There were kind of required colloquy that you might see in a case where there is a question of, well, you didn't raise this previously. Why didn't you raise it now? The IJ would be required to ask that question. Okay, but so this is all going to an analysis of dangerousness, really. You know, what she did, how she did it, what she says about it then, what she says about it now. I mean, the BIA is weighing all of that, correct? The BIA is required to weigh all of that, yes, Judge Beatty. I think they did not hear – and I would turn this court's attention in particular to the footnote in Gomez-Sanchez that specifically discussed – we said it a few times in our brief – that specifically discusses the case of a petitioner who has been – suffered from intimate partner violence, who also is currently suffering from PTSD, who is motivated by those facts, that those facts would be very relevant to the ultimate determination of whether or not the crime was particularly serious. And that is almost on the nose, this case. No, I understand your argument, and I want to explain to you why I thought what you said about Gomez-Sanchez was not correct, just in fairness so you know why I thought that. In Gomez-Sanchez, the court said that the particularly serious crime quote analysis permits consideration of an individual's motivation, and you characterize it as the BIA must consider an individual's motivation. I don't think it's necessarily the same. And I grant that you're in the position of an advocate, and I don't think it's outside the bounds of fairness, I'm just saying that I disagree with how you characterize the case. I appreciate that clarification, Judge Beatty. I will say, I mean, the court's required us to consider all facts, all relevant circumstances, and this is one that was plainly on the face of Ms. Perez's case and her testimony in this case. I know I'm much over my time, so I apologize. Let's hear from the government, and we'll make sure you get a chance to respond. Thank you, Judge Fletcher. Mr. Newell. Good afternoon. May it please the Court. My name is Craig Newell, and I'm here on behalf of the Attorney General. The Court should deny Ms. Perez's petition for review on both her withholding claims and her captive parole claim. Regarding the withholding claims, the Board applied the correct legal standard and did not abuse its discretion when it concluded that her first-degree California burglary conviction constituted a particularly serious crime. It considered all the factors required under NAM and for Francescu. It looked at the nature of the offense itself and the underlying facts and circumstances, which included her mental state at the time of the burglary and the significant four-year sentence that was imposed. Regarding Ms. Perez's reliance on the Flores-Vega decision, there are no imagined facts that were relied on by the Board. The Board just simply pointed out that Ms. Perez created a potential for an inherently dangerous situation because the victim, a homeowner, and her children returned while she was there. The imagined facts in Flores-Vega were, so in that case, it was a strangulation offense. What the Board did there, the Board said the victim likely had substantial fear during that strangulation and likely suffered bodily injury. But there was no record support for what happened to the victim. Here, in contrast, the Board wasn't speculating about what the victim and or her children thought about this situation. It laid out the facts that Ms. Perez planned this, premeditated this burglary, and that she created this potential for danger. Just by sheer luck, it didn't result in any violence. They considered that she jumped in a getaway car that sped away. What we have here is a weighing of the evidence as to these facts and circumstances. Yes, we have our testimony. Is there some feedback coming from you? It's from me. I apologize if it is. I'll move my computer. I don't know. Maybe it's my modem. Who'd you buy that one from? Is the feedback gone? Let me know, please. We have a case of competing evidence as to what her mental state was at the time of that burglary. And the Board just gave greater weight to the probation officer's report opposed to her testimony. And on the abuse of discretion deferential review, it's not for this court to re-weigh that evidence. It needs to look at whether it considered the proper factors. It did. Did it consider all the evidence? Yes, it did. And so the abuse of discretion standard, she can't meet that standard here. As to the cat deferral claim, I think the important thing to remember is that when we have a cat deferral claim that involves a private actor perpetrator, there are two actors that we have to analyze. And the first one is that private actor, the direct perpetrator. And then the second one is the governmental actor and his or her response or non-response when faced with that torture or the activity that happened. So if Ms. Perez, if she cannot show that the record evidence compels the conclusion that it's more likely than not that her former partner, Mr. Lopez, would torture her upon return to Mexico, by failing to meet that showing, that's dispositive of her cat deferral claim. And that finding was based on the totality of the circumstances. The board and the immigration judge, they looked at the fact that they knew Ms. Perez generally feared Mr. Lopez. He did abuse her horribly in the past for many years. But then it looked to the relocation issue. And it said, yes, there was this one incident where he tracked her down back to her hometown. But there's nothing remarkable that he would be able to find her in her hometown. Mexico is a very large country. Let me talk practically here. What's this poor woman to do? She's mentally challenged to stay there charitably. She apparently has no family. We're sending her to Mexico with two children. And it seems to me that if you just kind of think about how this is going to happen, it seems to me entirely plausible that Daniel, the parent of the child, will find her. Indeed, if she has no means of support, she might go find him despite the abuse. I mean, this is just inviting problems. I don't know about the legal standard and how it would apply here. She may lose. But this is just a disaster waiting to happen. I understand those concerns. And the money of those burdens and hardships are similar to the burdens of hardships to anyone who is removed from the country. She never tested in the United States. Her family is in the United States. We're sending a mentally disabled woman back to Mexico where she has no family. And there's just nothing. There's just nothing good to be said about this situation. I understand your point, Your Honor. But this Ms. Perez is a woman. This is a reinstated order of removal. She has been removed before, illegally reentered and violated. She is in disregard of the immigration laws. She has a somewhat extensive criminal history. And she does, as a probation officer and as the initial psychologist who found her incompetent to represent herself, she is prone to exaggeration. And so I think we are dealing with a very tough record, a very difficult situation. But in the end, we have one individual, her former partner. He seems nothing more than a common criminal. He has no connections to gangs, no connections to corrupt police officers. And, you know, if Ms. Perez is removed to Mexico, she can reasonably relocate to a large city that has mental health services for someone like her. And that's what the law dictates. Mental health services? What do you know about mental health services in Mexico? I do know that there are issues with them. And that was discussed. Well, she can find mental health services in Mexico. Easier said than done, of course. Oh, I agree. Everything is easier said than done. But this is, you know, this is she, a cap claim has a very high burden. It is the last, you know, ditch effort here. It is only based on objective evidence. It has the more likely to not standard. And on judicial review, it's whether the record evidence compels the conclusion that Daniel will find her and torture her. At least in 2010, he had the desire to go and locate her and find her in her hometown. But does he have the ability to find her throughout the country other than Tijuana in her hometown? And does the record compel the fact that he has that ability? It does not. And so that is why the cap deferral claim should be upheld on judicial review. You know, I was on a calendar earlier this month with Judge Hurwitz and Judge Watford. And we had a couple of immigration cases. They're always different than facts, but different immigration cases where the facts were particularly sympathetic. And the government was willing to mediate. Has there been any consideration of mediation in this case? Ms. Perez, at the moment, Ms. Perez's, you know, counsel hasn't reached out at any point. And at the moment, things are in flux as to any guidance from DHS as to their priorities for removal. And I think at the bottom, what is to be remembered here is that this is on a reinstated order of removal. This is someone who has violated the immigration laws, has been removed before, and illegally reentered. And so that's the situation. This is a tough case. I don't disagree, Your Honor. And if there are no further questions, I appreciate the honor's time this evening or this afternoon for you. Okay. Why don't we put two minutes on the clock for you, Ms. Charta? Thank you, Your Honor. A few points in response. First, with regard to Mr. Newell's emphasis on Ms. Perez's illegal reentry, it's clear from the record that that was also a symptom of her abuse, that Mr. Lopez forcibly returned her to the United States with him. So that, again, this all is a symptom of the abuse that she suffered in the first place. And I do want to also direct this court in particular to the decision in Erie v. Barr and Davila v. Barr, which have very similar facts to this case, in which the court found, first in Erie v. Barr, that a single instance of an abuser tracking someone down to another location was sufficient to compel the conclusion that the individual could not internally relocate. And then Davila v. Barr also discusses bribery of police officers. But going back to the particularly serious crime issue, I think there are two things that weren't quite borne out. One, the extent to which the government here or the board here considered duress. It's true that the BIA decision says that the IJ acknowledged Ms. Perez's testimony. But when you go to the IJ's decision, which this court can consider because the BIA cited matter of Burbano, it's clear that there is no reference to duress in that section of the decision at all. It's a catch-all statement that the court considered all the evidence and testimony and then goes directly into citing the probation report. And the government did the same thing in its analysis. And that's in the record at page... I can pull it up if it would be useful. That's in the record at page... I'm going to assume you're correct. 94 to 98. But doesn't our case law provide a presumption that the BIA in fact, or the agency in fact, does consider all the evidence and particularly when they say that they did? That you have to show that they didn't. You can't just say, oh, they just used a catch-all. That's not good enough because our case law says it is. But this case is... the duress issued here, again, which is something that this court has explicitly stated in Gomez-Rich-Sanchez, that in the case of a petitioner who is suffering from domestic violence, that those facts are particularly relevant. And to not even mention it in its discussion and turn completely to a prior statement is inconsistent with Gomez-Sanchez. I also want to talk very briefly about the question of dangerousness and whether the proper analysis is whether Ms. Perez's conduct at the moment of the crime was dangerous or whether the question is a presumption of dangerousness going forward and now. And the language of Gomez-Sanchez is that we have to ask whether this court and the board is required to ask whether the individual is, in the present tense, dangerous, not whether the moment of the crime was dangerous. And that, I think, is laid out plainly in Gomez-Sanchez because in that case, the petitioner attacked the victim with a barbell and physically injured him. It says he required stitches, the victim in that case. Yet, the question of his mental health was still relevant, regardless of the literal violence at the moment of the crime. We got it. Okay. Thank you very much. Thank you both sides for the argument. I would particularly like to thank Ms. Chartoff. You're doing this pro bono, is that correct? The court would like to recognize and to thank you for doing this and to compliment you on the quality of your work, written work, and oral advocacy, and we very much appreciate it. I will say the same thing to Mr. Nola, but only in a different sense. Mr. Nola, you're being paid, so I won't compliment you and thank you in quite the same way, but thank both sides for their arguments in this case. Perez-Cruz v. Garland, now submitted for decision. Thank you very much. And that concludes our argument for the day. This court for this session stands adjourned.
judges: W. Fletcher, Rawlinson, Bade